**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-Mail: scott@drurylegal.com

**ARISOHN LLC**
Joshua D. Arisohn (to be admitted *pro hac vice*)
94 Blakeslee Rd.
Litchfield, CT 06759
Telephone: (646) 837-7150
Email: josh@arisohnllc.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARISSA MELUNSKY, DANA CUTOLO, KATE SHIMSHOCK, MAUREEN CAREY, CAN OZDORUK and SHUBHRANSHU GUPTA, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LINKEDIN CORPORATION,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Clarissa Melunsky, Dana Cutolo, Kate Shimshock, Maureen Carey, Can Ozdoruk and Shubhranshu Gupta ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

### NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of consumers who used Defendant LinkedIn Corporation's ("LinkedIn" or "Defendant") LinkedIn Learning platform found at linkedin.com/learning (the "Website").

2.      Plaintiffs bring this action in response to Defendant's practice of integrating, installing and embedding third-party tracking technologies from Meta Platforms, Inc. ("Meta") and Adobe Inc. ("Adobe") (the "Tracking Technologies") into the Website and thereby enabling these third parties to intercept, capture and otherwise obtain, *inter alia*, users' personally identifiable information ("PII"), video-watching behavior, communications and related metadata.

3.      Defendant's conduct, as alleged herein, violates the: (a) the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* ("VPPA"); (b) the Electronic Communications and Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq.*; (c) the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631; (d) CIPA, Cal. Penal Code § 632; and (e) CIPA, Cal. Penal Code § 638.51(a).

### PARTIES

4.      Plaintiff Clarissa Melunsky is, and has been at all relevant times, a resident of San Francisco, California and has an intent to remain there, and is therefore a domiciliary of California. Plaintiff Melunsky created a Facebook account more than 10 years ago.  Plaintiff Melunsky has been a regular user of LinkedIn for several years.  She has also subscribed to Defendant's LinkedIn Premium service for several years and, through that subscription, Plaintiff Melunsky has had access to LinkedIn Learning and has watched several prerecorded video courses through that service.

5.    Plaintiff Dana Cutolo is, and has been at all relevant times, a resident of Staten Island, New York and has an intent to remain there, and is therefore a domiciliary of New York. Plaintiff Cutolo created a Facebook account more than 10 years ago.  Plaintiff Cutolo has been a regular user of LinkedIn for several years.  She has also been subscribed to Defendant's LinkedIn Premium service for several years and, through that subscription, Plaintiff Cutolo has had access to LinkedIn Learning and has watched several prerecorded video courses through that service.

6.    Plaintiff Kate Shimshock is, and has been at all relevant times, a resident of San Francisco, California and has an intent to remain there, and is therefore a domiciliary of California. Plaintiff Shimshock created a Facebook account more than 10 years ago.  Plaintiff Shimshock has been a regular user of LinkedIn for several years.  She has also been subscribed to Defendant's LinkedIn Premium service for several years and, through that subscription, Plaintiff Shimshock has had access to LinkedIn Learning and has watched several prerecorded video courses through that service.

7.    Plaintiff Maureen Carey is, and has been at all relevant times, a resident of San Mateo, California and has an intent to remain there, and is therefore a domiciliary of California. Plaintiff Carey created a Facebook account more than 10 years ago.  Plaintiff Carey has been a regular user of LinkedIn for several years.  In or around January 2024, Plaintiff Carey was subscribed to Defendant's LinkedIn Premium service and, through that subscription, Plaintiff Carey had access to LinkedIn Learning and watched at least one prerecorded video course through that service.

8.    Plaintiff Can Ozdoruk is, and has been at all relevant times, a resident of Emerald Hills, California and has an intent to remain there, and is therefore a domiciliary of California. Plaintiff Ozdoruk created a Facebook account more than 10 years ago.  Plaintiff Ozdoruk has been a regular user of LinkedIn for several years.  He has also been subscribed to Defendant's LinkedIn Premium service for several years and, through that subscription, Plaintiff Ozdoruk has had access to LinkedIn Learning and has watched several prerecorded video courses through that service.

9.    Plaintiff Shubhranshu Gupta is, and has been at all relevant times, a resident of

California and has an intent to remain there, and is therefore a domiciliary of California. He is currently a resident of Richmond, California. Plaintiff Gupta created a Facebook account more than 10 years ago. Plaintiff Gupta has been a regular user of LinkedIn for several years. He has also been subscribed to Defendant's LinkedIn Premium service for several years and, through that subscription, Plaintiff Gupta has had access to LinkedIn Learning and has watched several prerecorded video courses through that service.

10.     Defendant LinkedIn Corporation is a Delaware corporation with its principal place of business at 1000 West Maude Avenue, Sunnyvale, CA 94085. Defendant owns and operates the Website, which is used throughout the United States.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under laws of the United States.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

**I.     The Meta Pixel**

15.     Facebook, owned and operated by Meta, is the largest social networking service on the planet, touting 2.9 billion monthly active users. Meta describes Facebook as a "real identity platform,"[1] meaning users are allowed only one account and must share "the name they go by in everyday life."[2] To that end, when creating an account, Facebook users must provide their first and

---

[1] *Sam Schechner and Jeff Horwitz, How Many Users Does Facebook Have? The Company Struggles to Figure It Out,* WALL. ST. J. (Oct. 21, 2021).
[2] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

last name, along with their birthday and gender.

16.    Meta generates revenue by selling advertising space on the Facebook platform.

17.    Meta sells advertising space by highlighting its ability to target users.[3]  Meta can target users so effectively because it surveils user activity both on and off the Facebook platform. That allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[4]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[5]

18.    Advertisers can also build "Custom Audiences."[6]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."  Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audience," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[7]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Meta's "Business Tools," which collect and transmit the data automatically.  One such Business Tool is the Meta Pixel.

19.    The Meta Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Meta Pixel "tracks the people and type of actions they take."[8]  As

---

[3] FACEBOOK,WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[4] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[5] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.
[6] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[7] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401666390442328.
[8] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

soon as a user takes any action on a webpage that includes the Meta Pixel, it re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring.

20.     Through this technology, Meta intercepts each page a user visits, what videos they watch, what buttons they click, as well as specific information they input into the website and what they searched for.  The Meta Pixel sends each of these pieces of information to Meta with other identifiable information, such as the user's IP address and device and browser identifiers.  Meta stores this data on its own servers, in some instances, for years on end.

21.     Meta uses cookies named c_user, datr, fr and fbp to identify its account holders. Meta stores or updates Meta-specific cookies every time a person accesses their Facebook account from the same web browser.

22.     The Meta Pixel accesses these cookies and sends identifying information like the user's Facebook ID to Meta along with the other data relating to the user's website inputs.

23.     The c_user cookie value is the Meta equivalent of a user identification number. Each Facebook user account has one—and only one—unique c_user cookie.  Meta uses the c_user cookie to record user activities and communications.

24.     A user's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including their name, location, pictures, personal interests, work history, relationship status, and other details.  Because the user's Facebook ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook ID to quickly and easily locate, access, and view the User's corresponding Facebook profile.  To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

25.     The Meta datr cookie identifies the user's web browser.  It is an identifier unique to each person's specific web browser and is another way Meta can identify Facebook users.

26.     The Meta fr cookie is a combination of the Facebook ID (c_user) and the browser ID (datr) cookie values.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                     6

27.    The _fbp cookie attaches to a user's browser as a first-party cookie and enables Meta to identify a browser and a user.

## II.    The Meta Pixel's Integration with Adobe Audience Manager

28.    The Meta Pixel can be configured to integrate with tracking technology offered by Adobe that is known as Adobe Audience Manager, the Adobe Tracker or Demdex Tracker.

29.    Adobe Audience Manager gives "digital advertisers and publishers the tools they need to control and leverage their data assets to help drive sales success."[9]

30.    Through Adobe Audience Manager, website operators can create "Facebook Website Custom Audiences (WCA) pixels for the purpose of sending web-based Audience Manager audience segments to Facebook, for online ad targeting with improved transparency."[10]

31.    As shown below, when Adobe Audience Manager is integrated with the Meta Pixel, data flows from the website through Adobe Audience Manager to Facebook[11]:



32.    According to Adobe, the proper configuration of Adobe Audience Manager requires that URL information not be hidden or concealed because social media platforms, with whom that

[9] ADOBE, AUDIENCE MANAGER GUIDE, https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/aam-home#.

[10] FACEBOOK WCA INTEGRATION, https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/implementation-integration-guides/integrating-third-party/facebook-wca-integration#.

[11] *Id.*

data is shared, require that the URL information "be unmasked."[12]

33.    In short, when the Adobe Audience Manager is integrated with the Meta Pixel, the URL headers of webpages visited by website users are: (a) routed from the website to Adobe and then to Facebook; and (b) visible to both Adobe and Meta.

34.    In addition, when deployed on a website, the Adobe Tracker tracks visitor's communications and metadata including their IP address, page URL, browser and device characteristics, unique identifiers (including the demdex cookie), and session timing information.

**III.    LinkedIn Learning and the Tracking Technologies**

35.    LinkedIn Learning is an online learning platform with over 27 million users.  It offers prerecorded video courses designed to help people develop skills in business, technology, and creativity.  LinkedIn Learning offers 24,300 courses from over 3,900 industry experts and thought leaders in over 20 languages.

36.    At relevant times, to use LinkedIn Learning, LinkedIn users subscribed to LinkedIn Premium for a cost of $39.99/month.  Alternatively, businesses could purchase LinkedIn Learning subscriptions for their employees at a cost of several hundred dollars per year.

37.    At relevant times, each of LinkedIn Learning's pages hosting video classes contained code for the Meta Pixel and Adobe Audience Manager which, among other things, transmitted URL data in the form of full-string, descriptive URLs that contained detailed information regarding the webpage and video being viewed by a user, PII and other information to both Meta and Adobe.  The URLs disclosed to Meta and Adobe described, among other things, the contents of the videos to which they linked.

38.    Accordingly, the event data Defendant disclosed to Meta and Adobe permitted an ordinary person to identify what videos an individual has watched.

39.    In addition, the Website contained code for at least eight different third-party Meta cookies, including the c_user, datr, fr and _fbp cookies.

40.    When someone watched a video on the Website, the Meta Pixel transmitted PII

---

[12] *Id.*

from these Meta cookies to Meta along with their URL data, PII and other information.

41. The combination of descriptive URL data from the Meta Pixel and PII from the Meta cookies embedded on the Website permitted Meta and Adobe to see who watched what video.

42. Accordingly, Defendant used the Meta Pixel and Adobe Audience Manager to capture and disclose both the "contents" of its users' communications with the Website (the pages and videos that they viewed) as well as the "characteristics" of those communications (the users' IP addresses, their Facebook IDs, device identifiers, emails, and phone numbers).

43. Because Defendant configured the Meta Pixel on the Website to integrate with the Adobe Audience Manager platform, Adobe received the same data from Defendant, appended its own data set to it, and then sent that data to Meta as well.

## CLASS ALLEGATIONS

44. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the following Nationwide Class (the "Nationwide Class"):

> **Nationwide Class:** All persons in the United States who accessed the Website during a time in which Defendant integrated, embedded and/or installed one or more Tracking Technologies.

45. In addition, Plaintiffs bring this action, pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the following subclasses (collectively, the "Subclasses"):

> **California Subclass:** All persons who, while residing in California, accessed the Website during a time in which Defendant integrated, embedded and/or installed one or more Tracking Technologies.

> **Nationwide Video Subclass:** All subscribers to LinkedIn Premium in the United States who accessed the Website and watched a video during a time in which Defendant integrated, embedded and/or installed one or more Tracking Technologies.

46. Plaintiffs reserve the right to amend or modify the class and subclass definitions with greater specificity or division after having had the opportunity to conduct discovery.

47. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations—after considering any tolling, concealment and accrual issues—and ending on the date of entry of any judgment.

48.    Excluded from the Nationwide Class and Subclasses are: (a) Defendant; (b) any parent, affiliate or subsidiary of Defendant; (c) any entity in which Defendant has a controlling interest; (d) any officers or directors of Defendant; (e) any successor or assign of Defendant; and (f) counsel for Plaintiffs and Defendant.  Also excluded are any judge or court personnel assigned to this case and members of their immediate families.

49.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiffs do not know the exact number of members of the aforementioned Nationwide Class or Subclasses.  However, given the popularity of Defendant's Website, the number of persons within the Nationwide Class and Subclasses is believed to be so numerous that joinder of all members is impractical.

50.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Nationwide Class and Subclasses that predominate over questions that may affect individual members of the Nationwide Class and Subclasses include:

(a)    whether Defendant engaged in the wrongful conduct alleged herein;

(b)    whether the privacy rights of Plaintiffs and members of the Nationwide Class and Subclasses were violated;

(c)    whether Defendant violated the VPPA;

(d)    whether Defendant violated the ECPA;

(e)    whether Defendant violated the CIPA;

(f)    whether Defendant integrated, embedded and/or installed one or more Tracking Technologies within the Website; and

(g)    whether Plaintiffs and members of the Nationwide Class and Subclasses are entitled to actual, statutory, punitive and other forms of damages, as well as other monetary relief and equitable relief.

51.    **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiffs' claims are typical of those of members of the Nationwide Class and Subclasses because Plaintiffs, like all members of the

Nationwide Class and Subclasses, used Defendant's Website, including to watch videos via LinkedIn Learning.

52. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the ECPA, CIPA and the VPPA. Plaintiffs and their counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Nationwide Class and Subclasses. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Nationwide Class or Subclasses. Plaintiffs have raised viable statutory claims of the type reasonably expected to be raised by members of the Nationwide Class and Subclasses and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of Court to amend this Class Action Complaint to include additional representatives to represent the Nationwide Class and Subclasses, additional claims as may be appropriate, or to amend the definition(s) of the Nationwide Class and/or Subclasses to address any steps that Defendant took.

53. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Nationwide Class and Subclasses is impracticable. Even if every member of the Nationwide Class and Subclasses could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Nationwide Class and Subclasses. Plaintiffs anticipate no difficulty in the management of this action as a class action.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## CAUSES OF ACTION
### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*
### (On behalf Plaintiffs and the Nationwide Video Subclass)

54.    Plaintiffs restate and reallege the allegations above, as if fully set forth herein.

55.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Nationwide Video Subclass against Defendant.

56.    Defendant is a "video tape service provider" because it has created, hosted, and delivered dozens of prerecorded videos on the Website throughout the United States, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

57.    Plaintiffs and members of the Nationwide Video Subclass are "consumers" because they subscribed to Defendant's LinkedIn Premium service.  18 U.S.C. § 2710(a)(1).  This makes them "subscribers" and therefore "consumers" under the VPPA.

58.    Defendant disclosed to third parties Meta and Adobe the PII of Plaintiffs' and members of the Nationwide Video Subclass.  Defendant utilized the Meta Pixel and Adobe Audience Manager to compel the web browsers of Plaintiffs and members of the Nationwide Video Subclass to transfer their identifying information, including their Facebook IDs, along with their event data, including information about the videos they viewed to both Meta and Adobe.

59.    Plaintiffs and members of the Nationwide Video Subclass and viewed prerecorded videos on LinkedIn Learning.

60.    Defendant knowingly disclosed the PII and video viewing activity of Plaintiffs and members of the Nationwide Video Subclass because it knowingly integrated, embedded and installed the Meta Pixel and Adobe Audience Manager within LinkedIn Learning, and configured the two tracking technologies to integrate with each other.

61.    Plaintiffs and members of the Nationwide Video Subclass did not provide Defendant with any form of consent, written or otherwise, to disclose their PII or video viewing

activity to third parties.

62. Defendant's disclosures were not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Meta and Adobe were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

## COUNT II
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. § 2510, *et seq.*
### (On behalf of Plaintiffs and the Nationwide Class)

63. Plaintiffs restate and reallege the allegations above, as if fully set forth herein.

64. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Defendant.

65. Under the ECPA, it is unlawful for a person to intentionally intercept, endeavor to intercept or procure any other person to intercept or endeavor to intercept any wire, oral or electronic communication. 18 U.S.C. § 2511(1)(a).

66. Under the ECPA, it is unlawful for a person to intentionally use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

67. The ECPA protects both the sending and receipt of communications.

68. Under the ECPA, a "person" includes "any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

69. Under the ECPA, in relevant part, "electronic communication" means:

> any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate commerce or foreign commerce . . . .

18 U.S.C. § 2510(12).

70. Under the ECPA, "'intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    13

71. Under the ECPA, in relevant part, "'electronic, mechanical, or other device' means any device or apparatus which can be used to intercept a wire, oral, or electronic communication . . . ." 18 U.S.C. § 2510(5).

72. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

(a) The computer codes and programs for the Meta Pixel and Adobe Audience Manager, which were used to intercept, monitor, capture and record the communications and data transmissions of Plaintiffs and the members of the Nationwide Class while they were accessing and navigating the Website;

(b) Plaintiffs' and members of the Nationwide Class's browsers;

(c) Plaintiffs' and members of the Nationwide Class's computing and mobile devices; and

(d) The web servers of Meta and Adobe that were used to intercept the communications of Plaintiffs and members of the Nationwide Class.

73. Under the ECPA, "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of [the ECPA] may in a civil action recover from the person or entity . . . which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a).

74. Under the ECPA, the "court may assess as damages whichever is the greater of – (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000." 18 U.S.C. § 2520(c)(2). Additional appropriate relief includes: (a) equitable or declaratory relief; (b) punitive damages; and (c) a reasonable attorney's fee and other litigation costs reasonably incurred. 18 U.S.C. § 2520(b).

75. Defendant was, and continues to be, a "person" under the ECPA.

76. In violation of the ECPA, 18 U.S.C. § 2511(1)(a), Defendant intentionally procured Meta and Adobe to intercept the electronic communications of Plaintiffs and members of the Nationwide Class, namely the transmissions of their confidential and sensitive information, including their PII and communications regarding the videos they viewed. At relevant times, Defendant knew that by integrating, installing and embedding the Meta Pixel and Adobe Audience Manager, Meta

and Adobe would intercept the electronic communications of its users.

77.     In violation of the ECPA, 18 U.S.C. § 2511(1)(d), Defendant used, or endeavored to use, the contents of the electronic communications of Plaintiffs and members of the Nationwide Class to generate profits and increase revenues by, *inter alia*, using the intercepted communications to target its users with advertisements, knowing and having reason to know that the information was obtained through the unlawful interception of the electronic communications of Plaintiffs and members of the Nationwide Class, in violation of the ECPA, as alleged herein.

78.     Defendant knew and had reason to know that it procured Meta and Adobe to intercept the electronic communications at issue and it used the fruits thereof in violation of the ECPA, as Defendant did not obtain the consent of Plaintiffs or members of the Nationwide Class to intercept the electronic communications and, as alleged below, did so for criminal and tortious purposes.

79.     At the time of the above-described electronic communications, Plaintiffs and members of the Nationwide Class exhibited an expectation that the communications were not subject to interception under circumstances justifying such an expectation, as alleged herein.

80.     Plaintiffs and members of the Nationwide Class did not consent to the interception and/or disclosure of their sensitive and confidential electronic communications via the Website.

81.     At the time Defendant intentionally procured Meta and Adobe to intercept and endeavor to intercept the electronic communications of Plaintiffs and members of the Nationwide Class, Defendant was not acting under color of law.

82.     Defendant procured Meta and Adobe to intercept and endeavor to intercept the electronic communications of Plaintiffs and members of the Nationwide Class for the purpose of violating the VPPA, the CIPA and the privacy rights of Plaintiffs and members of the Nationwide Class.

83.     Plaintiffs and members of the Nationwide Class seek all relief to which they are entitled under the ECPA, including statutory damages, punitive damages, equitable and declaratory relief and attorneys' fees and costs.

84.     Unless and until enjoined and restrained by order of this Court, the wrongful

conduct of Defendant will continue to cause great and irreparable injury to Plaintiffs and members of the Nationwide Class in that Defendant will continue to engage in the unlawful conduct alleged herein.  Plaintiffs and members of the Nationwide Class have no adequate remedy at law for their injuries in that a judgment for monetary damages will not end the unlawful conduct of Defendant.

**COUNT III**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**
**(On behalf of Plaintiffs and the California Subclass)**

85.     Plaintiffs restate and reallege the allegations above, as if fully set forth herein.

86.     Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendant.

87.     In violation of the CIPA, Defendant aided, and agreed and conspired with Meta and Adobe to permit and cause to be done proscribed conduct under § 631(a) of the CIPA, as alleged herein, including but not limited to integrating and embedding the Meta Pixel and Adobe Audience Manager into the Website.

88.     The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA or constitute "any other manner" as used in the CIPA:

(a)     The computer codes and programs for the Meta Pixel and Adobe Audience Manager, which were used to intercept, monitor, capture and record the communications and data transmissions of Plaintiffs and the members of the California Subclass while they were accessing and navigating the Website;

(b)     Plaintiffs' and members of the California Subclass's browsers;

(c)     Plaintiffs' and California Subclass's computing and mobile devices; and

(d)     The web servers of Meta and Adobe that were used to intercept the communications of Plaintiffs and members of the California Subclass.

89.     Plaintiffs and California Subclass members did not consent to the unlawful conduct of Defendant, as alleged herein.

90.     Among the contents of communications, data transmissions and messages Meta and Adobe intercepted, read, attempted to read and learned were the contents of Plaintiffs and California Subclass members' video watching behavior.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    16

91.    By engaging in the unlawful conduct alleged herein, Defendant violated Plaintiffs' and California Subclass members' statutorily-protected right to privacy.

92.    Because Plaintiffs and California Subclass members reside in California, Defendant's violations of the CIPA, as alleged herein, occurred in California.

93.    As a result of the conduct alleged herein, under the CIPA, Defendant is liable to Plaintiffs and each California Subclass member in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.

94.    Unless and until enjoined and restrained by order of this Court, the wrongful conduct of Defendant will continue to cause great and irreparable injury to Plaintiffs and California Subclass members because Defendant will continue to unlawfully tap and intercept the contents of LinkedIn Learning users' communications within LinkedIn Learning while they access and navigate LinkedIn Learning.  Plaintiffs and California Subclass members have no adequate remedy at law for their injuries in that a judgment for monetary damages will not end the unlawful conduct of Defendant.

## COUNT IV
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 632
### (On behalf of Plaintiffs and the California Subclass)

95.    Plaintiffs restate and reallege the allegations above, as if fully set forth herein.

96.    Plaintiffs bring this claim against Defendant individually and on behalf of the California Subclass.

97.    Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication.

98.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

99.    The data collected on Defendant's Website constitutes "confidential communications," as that term is used in Section 632, because Plaintiffs and California Subclass members had an objectively reasonable expectation of private with respect to their PII and video

watching behavior.

100.    Plaintiffs and California Subclass members expected their communications with Defendant to be confined to Defendant in part because Defendant purportedly discloses in its Privacy Policy and Cookie Policy what information it shares with third parties, but did not disclose that it would share the URLs that users visit, or the videos that they watch, with Meta and/or Adobe.  Accordingly, consistent with Defendant's representations, Plaintiffs and California Subclass members reasonably expected that these communications would remain confidential. Plaintiffs and California Subclass members did not expect that Meta and Adobe would secretly eavesdrop on them and record their communications.

101.    The Meta Pixel and Adobe Audience Manager are both electronic amplifying or recording devices for purposes of § 632.214.  By contemporaneously intercepting and recording Plaintiffs' and California Subclass members' confidential communications with Defendant through this technology, Meta and Adobe eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

102.    At no time did Plaintiffs or California Subclass members consent to Defendant, Meta or Adobe eavesdropping on their communications, nor could they reasonably expect that their communications with Defendant would be overheard or recorded by Meta or Adobe.

103.    Meta and Adobe utilized Plaintiffs' and California Subclass members' PII and other data for their own purposes, including advertising and analytics.

104.    Defendant is liable for aiding and abetting violations of Section 632 by Meta and Adobe.

105.    As a result of the conduct alleged herein, under the CIPA, Defendant is liable to Plaintiffs and each California Subclass member in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.

106.    Unless and until enjoined and restrained by order of this Court, the wrongful conduct of Defendant will continue to cause great and irreparable injury to Plaintiffs and California Subclass members because Defendant will continue to unlawfully tap and intercept the contents of

LinkedIn Learning users' communications within LinkedIn Learning while they access and navigate LinkedIn Learning.  Plaintiffs and California Subclass members have no adequate remedy at law for their injuries in that a judgment for monetary damages will not end the unlawful conduct of Defendant.

**COUNT V**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 638.51(a)**
**(On behalf of Plaintiffs and the California Subclass)**

107. Plaintiffs restate and reallege the allegations above, as if fully set forth herein.

108. Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendant.

109. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

110. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

111. The Meta Pixel and Adobe Audience Manager are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"— the IP address, device and browser identifiers, and unique user IDs—from the electronic communications transmitted by Plaintiff'' and the California Subclass members' computers or smartphones.  Cal. Penal Code § 638.50(b).

112. Likewise, the Meta Pixel and Adobe Audience Manager are "pen registers" because they are "device[s] or process[es]" that are being used to ascertain the identity of visitors to Defendant's Website, and are thus capturing "addressing" information.  *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

113. At all relevant times, Defendant installed the Meta Pixel and Adobe Audience Manager on the browsers of Plaintiffs and members of the California Subclass, which allowed Meta and Adobe to record or decode the IP addresses, device and browser identifiers, and unique

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                    19

user IDs of Plaintiffs and members of the California Subclass.  The Meta Pixel and Adobe Audience Manager also set a unique user identifier on the browsers of Plaintiffs and members of the California Subclass so that Meta and Adobe could de-anonymize Plaintiffs and members of the California Subclass and track them across multiple Website sessions and multiple websites.

114.    Defendant, Meta and Adobe used the information collected by the Meta Pixel and Adobe Audience Manager to:

(a)    identify Plaintiffs and members of the California Subclass and either create new profiles of them in Meta's and/or Adobe's databases or match Plaintiffs and members of the California Subclass to pre-existing profiles;

(b)    sell the information of Plaintiffs and members of the California Subclass to advertisers for hyper-targeted advertising based on the information collected by Meta and Adobe on the Website and the information contained in any profiles of Plaintiffs and members of the California Subclass;

(c)    actually target Plaintiffs and members of the California Subclass with advertisements and serve advertisements on them; and

(d)    de-anonymize Plaintiffs and members of the California Subclass and generate revenue from the sale of that information.

115.    Plaintiffs and members of the California Subclass did not provide their prior consent to Defendant tracking and sharing their IP address, device and browser identifiers, and unique user IDs with Meta and/or Adobe

116.    As a result of the conduct alleged herein, under the CIPA, Defendant is liable to Plaintiffs and each California Subclass member in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.

117.    Unless and until enjoined and restrained by order of this Court, the wrongful conduct of Defendant will continue to cause great and irreparable injury to Plaintiffs and California Subclass members because Defendant will continue to unlawfully tap and intercept the contents of LinkedIn Learning users' communications within LinkedIn Learning while they access and navigate LinkedIn Learning.  Plaintiffs and California Subclass members have no adequate remedy at law for their injuries in that a judgment for monetary damages will not end the unlawful conduct of Defendant.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)    Certifying the Nationwide Class and Subclasses under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Nationwide Class and Subclasses, and naming Plaintiffs' attorneys as Class Counsel to represent the Nationwide Class and Subclasses;

(b)    Declaring that Defendant's conduct violates the statutes referenced herein;

(c)    Finding in favor of Plaintiffs and the Nationwide Class and Subclasses on all counts asserted herein;

(d)    Awarding statutory damages to the extent available;

(e)    Awarding prejudgment interest on all amounts awarded;

(f)    Ordering injunctive relief as pleaded or as the Court may deem proper; and

(g)    Awarding Plaintiffs and the Nationwide Class and Subclasses their reasonable attorneys' fees and expenses and costs of suit.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs demand a trial by jury of all issues so triable.

Dated: April 23, 2026

**DRURY LEGAL, LLC**

By:  */s/ Scott R. Drury*
        Scott R. Drury

Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-Mail: scott@drurylegal.com

**ARISOHN LLC**
Joshua D. Arisohn  (to be admitted *pro hac vice*)
94 Blakeslee Rd.
Litchfield, CT 06759
Telephone: (646) 837-7150
Email: josh@arisohnllc.com

*Attorneys for Plaintiffs*